**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**COLUMBIA DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| | CA No. _____ |
| *ex rel*. [UNDER SEAL], | |
| Plaintiff-Relator, | |
| | **COMPLAINT** |
| v. | **(Jury Trial Demanded)** |
| [UNDER SEAL] | |
| Defendant. | |

# FILED *IN CAMERA* AND UNDER SEAL
# PURSUANT TO 31 U.S.C. § 3730(b)(2)
# (Exempt from ECF)

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | CA No. __3:14-cv-03653-CMC__ |
| *ex rel*. DAVID H. HAMMETT, M.D., | |
| Plaintiff-Relator, | **FILED *IN CAMERA* AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)** |
| v. | |
| LEXINGTON COUNTY HEALTH SERVICES DISTRICT, INC d/b/a LEXINGTON MEDICAL CENTER | **COMPLAINT (Jury Trial Demanded)** |
| Defendant. | |

Plaintiff-Relator David H. Hammett, M.D. files this Complaint pursuant to the federal False Claims Act (FCA), 31 U.S.C. §§ 3729 et seq., the Stark Act (Stark Act or Stark Law), 42 U.S.C. § 1395nn, and the Anti-Kickback Act (AKA), 41 U.S.C. §§ 8701 et seq., to recover monies illegally obtained by Defendant Lexington Medical Center from federal health insurance programs. Plaintiff would respectfully show the Court as follows:

**JURISDICTION AND VENUE**

1.      This action arises under the FCA, Stark Law, and the AKA. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 & 1345 and 31 U.S.C. §§ 3730(b) & 3732(a).

2.      This Court has personal jurisdiction over Defendant pursuant to 31 U.S.C. § 3732(a) because Defendant transacts business in this District and numerous acts prohibited by federal law occurred in this District.

2

3.      Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because Defendant transacts business in this District and numerous acts prohibited by federal law occurred in this District.

4.      Dr. Hammett's claims and this Complaint are not based upon the prior public disclosure of allegations or transactions in a criminal, civil, or administrative hearing in which the Government or its agent is a party; in a congressional, Government Accountability Office, or other federal report, hearing, audit, or investigation; or from news media, as enumerated by 31 U.S.C. § 3730(e)(4)(A). To the extent there has been a public disclosure unknown to Dr. Hammett, he is the "original source" and the public disclosure is a result of Dr. Hammett voluntarily providing this information to the United States prior to filing this *qui tam* action. See 31 U.S.C. § 3730(e)(4)(B).

## PARTIES

5.      Plaintiff-Relator David H. Hammett, M.D., is a medical doctor and citizen residing in the State of South Carolina. Dr. Hammett has brought this action on behalf of the United States of America and its agencies, including the Department of Health and Human Services (HHS) and the Centers for Medicare and Medicaid Services (CMS). Dr. Hammett obtained the direct personal knowledge of the facts alleged here during his employment by Lexington Medical Center.

6.      Defendant Lexington County Health Services District, Inc. d/b/a Lexington Medical Center (LMC) is a regional health services district incorporated in the State of South Carolina. LMC provides inpatient and outpatient health care services through a countywide healthcare network that includes a 400+ bed hospital, six satellite medical and urgent care centers, an occupational health center, an extended care facility, 60 medical practices, and over

600 physicians. LMC's registered agent and CEO is Michael J. Biediger. LMC's corporate headquarters, hospital, and principal place of business is Lexington County at 2720 Sunset Boulevard, West Columbia, South Carolina. LMC receives substantial revenue as compensation for healthcare services provided to individuals insured by federal health insurance programs, such as Medicare and TRICARE/CHAMPUS, and state health insurance programs supported by federal monies, such as Medicaid (collectively, "federal health insurance programs"). LMC's submission of claims for payment to these programs includes an affirmative certification by LMC that it will abide by, and has abided by, all statutes, rules, and regulations governing the Medicare, TRICARE/CHAMPUS, and Medicaid programs. All of the actions attributed to LMC in this Complaint were taken by employees and/or agents acting within the scope of their employment and/or agency with LMC.

## RELEVANT STATUTORY AND REGULATORY AUTHORITY

### The Medicare Program

7.    When Congress passed the Social Security Act of 1965, it created the Medicare Program; a remedial federal health insurance program designed to ensure "adequate medical care is available to the aged throughout this country." Hultzman v. Weinberger, 495 F.2d 1276, 1281 (3d Cir. 1974); see also Title XVIII of the Social Security Act, 42 U.S.C. §§ 426, 426A.

8.    Medicare Part A authorizes payment for institutional care, including hospital, skilled nursing facility and home health care. See 42 U.S.C. §§ 1395c-1395i-4. Most hospitals, including LMC, derive a substantial portion of revenue from treating Medicare beneficiaries and billing the Medicare program.

9.    Medicare provides reimbursement to provider hospitals depending on the patient's status as either inpatient or outpatient.

10.     Hospital outpatient services are reimbursed on the Hospital Outpatient Prospective Payment System (HOPPS).  All such services are classified into groups called Ambulatory Payment Classifications (APCs). Services in each APC are clinically similar in terms of the resources they require. A payment rate is established for each APC. Depending on the services provided, hospitals may be paid for more than one APC for an encounter.

11.     Hospital inpatient services are reimbursed under the Inpatient Prospective Payment System (IPPS). IPPS is a system that classifies hospital cases into one of approximately 500 groups, also referred to as "DRGs," expected to use similar hospital resources. DRGs have been used since 1983 to determine Medicare's hospital reimbursement rate. DRGs can also be grouped into Major Diagnostic Categories (MDCs).

12.     Medicare reimburses services for inpatients at a higher rate than outpatient care, thus creating an incentive to unlawfully admit patients as inpatients.

13.     Once a Medicare beneficiary is discharged, the hospital submits claims for interim reimbursement for services.  42 C.F.R. §§ 413.1, 413.60, 413.64.  This requires a hospital to submit patient-specific claims for interim payments on CMS Form UB-04 (formerly UB-92) to Medicare's fiscal intermediary.

14.     In addition to submitting an interim claim, CMS also requires Medicare provider hospitals to submit an annual "Hospital Cost Report" on form CMS-2552.  The Hospital Cost Report is a final claim by a provider in which a provider declares its annual Medicare reimbursement to the fiscal intermediary for items and services provided to Medicare beneficiaries that year. See 42 U.S.C. § 1395g(a); 42 C.F.R. § 413.20; see also 42 C.F.R. § 405.1801(b)(1). Medicare relies on the Hospital Cost Report to determine whether the provider is entitled to more reimbursement than already received through interim payments, or whether the

provider has been overpaid and must reimburse Medicare. 42 C.F.R. §§ 405.1803, 413.60 & 413.64(f)(1).

15.     Each Hospital Cost Report contains an express certification that must be signed by the provider's chief administrator or designee. The Hospital Cost Report Certification warns providers that:

> MISREPRESENTATION OR FALSIFICATION OF ANY INFORMATION CONTAINED IN THIS COST REPORT MAY BE PUNISHABLE BY CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINE AND/OR IMPRISONMENT UNDER FEDERAL LAW. FURTHERMORE, IF SERVICES IDENTIFIED IN THIS REPORT WERE PROVIDED OR PROCURED THROUGH THE PAYMENT DIRECTLY OR INDIRECTLY OF A KICKBACK OR WERE OTHERWISE ILLEGAL, CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINES AND/OR IMPRISONMENT MAY RESULT.

This warning is followed by the certification language requiring administrators to certify that they have read this warning and certify that the cost report is "a true, correct and complete statement prepared from the books and records of the provider in accordance with applicable instructions, except as noted." Providers must also affirm that they are "familiar with the laws and regulations regarding the provision of the health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations."

16.     A hospital also has an affirmative duty to disclose all known errors and omissions in its Medicare reimbursement claims to the fiscal intermediary. 42 U.S.C. § 1320a-7b(a)(3) ("Whoever [...] having knowledge of the occurrence of any event affecting (A) his initial or continued right to any such benefit or payment [...] conceals or fails to disclose such event with an intent fraudulently to secure such benefit or payment either in a greater amount or quantity than is due or when no such benefit or payment is authorized [...] shall [...] be guilty of a felony.").

17.     Annual Medicare reimbursement payments for inpatient hospital services are determined by adding the total claims submitted by the provider for particular patient discharges (specifically listed on UB-04s) during the course of the fiscal year to any other Medicare liabilities. Interim payments made during the course of the fiscal year are subtracted from this sum to determined whether Medicare owes the hospital or whether the hospital owes Medicare.

18.     When patients are improperly admitted as inpatients, the DRG, interim reimbursements, and Hospital Costs Reports are unlawfully increased to the detriment of the Medicare Program.

19.     At all relevant times to this Complaint, LMC submitted claims for interim payments and Hospital Cost Reports to Medicare through its fiscal intermediary and received payment for services rendered to Medicare beneficiaries. These submissions contained certifications by LMC employees on LMC's behalf making the aforementioned certifications to the Medicare Program.

**The TRICARE/CHAMPUS Program**

20.     The Civilian Health and Medical Program for the Uniformed Services known as TRICARE Management Activity (TRICARE/CHAMPUS) provides federal health insurance for active duty members of the armed forces and their families at non-military healthcare facilities. 10 U.S.C. §§ 1971-1106; 32 C.F.R. § 199.4(a).

21.     TRICARE/CHAMPUS reimburses hospital providers for healthcare services provided to program beneficiaries on an interim basis and for capital and educational costs incurred as reflected by the hospital's Medicare cost report. 32 C.F.R. § 199.6. Like Medicare, TRICARE/CHAMPUS reimburses hospitals based on the providers "Request for Reimbursement of CHAMPUS Capital and Direct Medical Education Costs" in which the

provider certifies the number of TRICARE/CHAMPUS patient days and financial information using the Medicare cost report for that facility, and certifies that the submission is "accurate and based upon the hospital's Medicare cost report."

22.    Once received, the fiscal intermediary applies a reimbursement formula using the data furnished by the provider to reimburse a percentage of the hospital's capital and medical education costs proportional to the percentage of TRICARE/CHAMPUS patients in the facility.

23.    At all relevant times to this Complaint, LMC submitted claims for interim payments and for reimbursement to TRICARE/CHAMPUS through its fiscal intermediary and received payment for services rendered to TRICARE/CHAMPUS beneficiaries. These submissions contained certifications by LMC employees on LMC's behalf making the aforementioned certifications to the TRICARE/CHAMPUS program.

### The Medicaid Program

24.    The Medicaid Program is a joint federal-state program that provides health insurance benefits to poor and disabled persons. Medicaid is administered by the states, making federal involvement in the program limited to providing matching funds and ensuring states comply with certain minimum standards for federal financial participation (FFP). 41 U.S.C. §§ 1396 et seq.

25.    One minimum requirement is that states' Medicaid program must cover hospital services. 42 U.S.C. § 1396a(10)(A); id. § 1396d(a)(1)-(2). In many states, provider hospitals file annual cost reports with the state's Medicaid agency, or its intermediary, similar to the protocol governing Medicare cost report submissions.

26.    Some states allow hospitals to file the Medicare cost report to calculate Medicaid reimbursement in lieu of filing a state-specific cost report.  Regardless, Medicaid providers

report the same type of financial data (*e.g.*, the number of patients treated) in Medicaid cost reports as is reported in Medicare cost reports.

27.    Medicaid cost reports, whether they incorporate Medicare's reporting requirement or implement their own, require a provider to expressly certify that the information provided is true and correct.

28.    At all relevant times to this Complaint, LMC submitted claims for interim payments and for reimbursement to Medicaid through its fiscal intermediary and received payment for services rendered to Medicaid beneficiaries. These submissions contained certifications by LMC employees on LMC's behalf to the Medicaid Program.

**The False Claims Act**

29.    The False Claims Act (FCA) provides, in relevant part, that:

> any person who--(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
>
> (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; […]
>
> (D) has possession, custody, or control of property or money used, or to be used, by the Government and knowingly delivers, or causes to be delivered, less than all of that money or property; […] or
>
> (G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,
>
> * * *
>
> is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-4101), plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C. § 3729(a)(1).

## The Stark Law

30.     The Stark Law, 42 U.S.C. § 1395nn,[1] prohibits a hospital (or other provider) from submitting claims for payment to federal insurance programs when those claims arise from a patient referral from physician that has a "financial relationship" with the hospital.

31.     At all times relevant here, the Stark Law applied to patient referrals by physicians with a prohibited financial relationship for "designated health services" including laboratory services; inpatient and outpatient hospital services; physical therapy; occupational therapy; radiology; radiation therapy; durable medical equipment and supplies; parenteral and enteral nutrients, equipment, and supplies; prosthetics, orthotics, and prosthetic devices and supplies; outpatient prescription drugs; and home health services. See 42 U.S.C. § 1395nn(h)(6).

32.     The Stark Law provides, in pertinent part, that a physician may not make a referral "if the physician (or an immediate family member of such physician) has a financial relationship with the referred provider." 42 U.S.C. § 1395nn(a)(1)(A). Additionally, the provider "may not present or cause to be presented a claim" of reimbursement "for designated health services furnished pursuant to a referral prohibited [by the Act]." Id. § 1395nn(a)(1)(B).

33.     The Stark Law also prohibits profit sharing between providers and employee physicians unless the self-interested referral meets one of the Act's explicit exceptions, such as a profit-sharing provision contained in an employment agreement. Specifically, hospitals can

---

[1] The Stark Law was adopted in two parts, commonly called Stark I and Stark II. Stark I applied to referrals for clinical laboratory services. See Omnibus Budget Reconciliation Act of 1989, P.L. 101-239, § 6204. In 1993, Congress extended the law (Stark II) to referrals for ten additional designated health services. See Omnibus Reconciliation Act of 1993, P.L. 103-66, § 13562, Social Security Act Amendments of 1994, P.L. 103-432, § 152.

compensate employee physicians fir referrals "provided that the compensation arrangement meets all of the following conditions[:]"

(i) Is set *in advance* for the term of the agreement.

(ii) Is *consistent with fair market value* for services performed (that is, *the payment does not take into account the volume or value* of anticipated or required referrals).

(iii) Otherwise complies with an applicable exception under § 411.355 or § 411.357.

(iv) Complies with both of the following conditions:

> (A)     The requirement to make referrals to a particular provider, practitioner, or supplier is set forth in a written agreement signed by the parties.

> (B)     The requirement to make referrals to a particular provider, practitioner, or supplier does not apply if the patient expresses a preference for a different provider, practitioner, or supplier; the patient's insurer determines the provider, practitioner, or supplier; or the referral is not in the patient's best medical interests in the physician's judgment.

(v)     The required referrals relate solely to the physician's services covered by the scope of the employment or the contract, and the referral requirement is reasonably necessary to effectuate the legitimate business purposes of the compensation arrangement. In no event may the physician be required to make referrals that relate to services that are not provided by the physician under the scope of his or her employment or contract.

42 C.F.R. 411.354(d)(4) (emphasis added).

34.     The Stark Law is a strict liability statute: if no exception applies, then all self-interested referrals are subject to disallowance. Any payment received for a service performed as a result of a prohibited referral must be refunded to Medicare. 42 C.F.R. § 411.353.

35.     By adopting the Stark Law, Congress sought to ensure that only medically necessary services were paid from the federal fisc by removing doctors' pecuniary incentive to refer patients to providers with whom they had a financial relationship. By adopting the referral

prohibition, Congress credited evidence that physicians with a financial interest in a hospital used more of the hospital's services than similarly situated physicians without a financial interest.

### The Anti-Kickback Statute

36.    The federal Anti-Kickback Act (AKA), 42 U.S.C. § 1320-7b(b) makes it a crime to knowingly and willfully offer, pay, solicit or receive any remuneration to induce a person to refer an individual for any item or service covered by a federal health care program or "to purchase, lease, order, arrange for or recommend any good, facility, service, or item covered under a federal health care program. 42 U.S.C. § 1320a-7b(b)(1) & (2).

37.    "Any remuneration" means any kickback, bribe, or rebate, direct or indirect, overt or covert, cash or in kind.  42 U.S.C. § 1320a-7b(b)(1).  Any ownership interest or compensation arrangement that constitutes a financial relationship under the Stark Laws also constitutes a remuneration under the AKA unless a safe harbor applies.

38.    AKA violations are a felony punishable by a maximum fine of $25,000, imprisonment up to five years, or both, and exclusion from federal health care programs for at least five years. See 42 U.S.C. § 1320a-7b.

39.    In addition to the statute's criminal penalties, the HHS Secretary has administrative power to find a provider violated the AKA and to impose administrative penalties including exclusion and sanctions of $10,000 per kickback violation. 42 U.S.C. § 1320a-7a.

40.    The statute's prohibition against knowing and willful conduct in disregard of the law (see 42 U.S.C. §1320a-7b(b)(1)) extends to any arrangement where the remuneration is payment for referrals or to induce further referrals. United States v. Kats, 871 F.2d 105 (9th Cir. 1989); United States v. Greber, 760 F.2d 68 (3d Cir.), cert. denied, 474 U.S. 988 (1985).

41.     HHS promulgates regulations defining safe harbor practices not subject to the AKA because the Secretary has deemed the excluded practices unlikely to result in fraud or abuse. See 42 C.F.R. §1001.952.  The safe harbors set conditions that, if met, will not give rise to criminal or administrative action.

## FACTUAL ALLEGATIONS CONCERNING
## LEXINGTON MEDICAL CENTER'S FRAUDULENT CONDUCT

42.     Notwithstanding its clear obligation under federal law and the terms of federal insurance programs, LMC has billed and continues to bill CMS for self-interested referrals from its extensive network of approximately 275 employee physicians.

43.     Through its hub-and-spoke business model, LMC incentivizes physician referrals to the hospital by using a physician compensation formula that credits past and future physician referrals and the value of those referrals to set physician compensation. The illicit nature of this scheme is evidenced by LMC physician compensation, which far exceeds fair market value of the services provided, and LMC's own internal referral tracking reports.

44.     Moreover, the referral-compensation scheme at issue here is *never* lawful since none of LMC's employee contracts contain the requisite elements that would afford this scheme the safe-harbor protection provided by 42 C.F.R. 411.354(d)(4).

45.     Instead, and as explained below, when LMC physicians refer patients to providers other than LMC, they are investigated by LMC and pressured to refer future business to LMC.

### LMC's physician compensation scheme violates the Stark Laws
### and results in the submission of false claims to federal insurance programs

46.     Prior to June 2011, Dr. Hammett worked for Columbia Medical Group, ("CMG"), a physician group operating in Richland County, South Carolina. CMG owned multiple imaging

machines including a MRI, a CT scanner, and others that generated large profits for CMG and, ultimately, its physician owners. Dr. Hammett was not a partner at CMG.

47.     In June 2011, LMC purchased CMG and entered into individual employment agreements with CMG's physicians including Dr. Hammett. Dr. Hammett's employment agreement is attached to this Complaint as **Exhibit A** and is incorporated herein by reference.

48.     LMC's employment agreements offered CMG physicians compensation equal to or in excess of the compensation CMG's physicians received as CMG owners/employees sharing in the profits of CMG's lucrative imaging services. CMG's owners' prior compensation was largely comprised of the profits generated by the ancillary services owned by the practice.

49.     Prior to the sale, CMG was also negotiating a possible sale to LMC's competitors. By comparison, LMC offered CMG physicians compensation that was far in excess of the offers made by other hospitals.

50.     The total compensation LMC agreed to pay many, if not all CMG physicians, was far in excess of fair market value an expressly accounted for the volume or value of the CMG physicians' historical referrals in anticipation of all future referrals being made to LMS.  For example, at least one former CMG physician practicing internal medicine was compensated by LMC with a salary in excess of $500,000. By comparison, the Medical Group Management Association's 2013 report finds the median salary for family medicine physicians is $224,110 with the 90th percentile earning $364,485 or more.

51.     In addition to inflated salaries, LMC paid CMG physicians "bonuses" for services rendered prior to the acquisition after the practice acquisition closing. These payments were not included in either the practice acquisition agreement or any physician employment agreement. These bonuses are believed to have been paid from the premium paid by LMC to acquire CMG.

52.    During negotiations, LMC told CMG physicians, including Dr. Hammett, that the offered compensation was intended to account for profits the CMG physicians would have made from the ancillary services previously offered by CMG but being purchased by LMC. In other words, LMC offered CMG physicians, including Dr. Hammett, compensation in excess of the net collections received for the services former CMG physicians would provide by compensating physicians for ancillary patient services LMC anticipated would be referred by the CMG physicians to LMC.

53.    After LMC acquired CMG, LMC compensated physicians in excess of the net collections received for the physician's professional services under a relative value unit (RVU) compensation formula that credited physicians for the volume and value of the services they referred to LMC.

54.    Typically, an RVU compensation formula compensates physicians using a resource-based relative value scale (RBRVS) that accounts for the relative value of the service provided by the physician, the expense incurred in providing the service, and the cost of malpractice coverage. These factors are adjusted based on a geographic pricing index and multiplied by a conversion factor to determine the overall compensation owed.

55.    After acquisition, former CMG physicians continued making referrals to LMC for ancillary services.

56.    LMC strictly tracks employee physician referrals and provides employees with regular, detailed reports comparing their referral performance against one another. LMC executives routinely discuss these reports and review their effect on practice management. For example, one LMC referral tracking report compares former CMG physicians' referrals to LMC

compared to the number and value of the referrals physicians were making to CMG's imaging services prior to the acquisition.

57.     LMC's referral tracking system evidences LMC's consideration of the volume and value of physician referrals in setting employee compensation. This consideration is *per se* commercially unreasonable. See 42 C.F.R. § 411.351 (defining "fair market value").

58.     This scheme also explains LMC's motive for compensating physicians in excess of fair market value in anticipation of those physicians referring more lucrative ancillary services to LMC. LMC's willingness to compensate employee physicians in excess of a commercially reasonable rate is evidence of LMC's hub-and-spokes strategy whereby employee physicians seeing patients at LMC's satellite campuses are expected to, and compensated for, referring patient services back to LMC's hospital hub in exchange for a compensation model that credits physicians for generating this revenue.

59.     On or around May 2013, Dr. Hammett referred a number of MRI studies to a non-LMC provider due to patient preference and/or insurance costs.

60.     Immediately thereafter, LMC opened an investigation of Dr. Hammett's referrals. This investigation included multiple management-level meetings and LMC patient interviews seeking information about Dr. Hammett's referrals to outside providers.

61.     In May 2013, LMC executives demanded a meeting with Dr. Hammett to discuss his referral patterns. During that meeting, these executives questioned Dr. Hammett about his reasons for referring patients outside the LMC network and told him that his actions were putting jobs at risk.

62.     During that meeting, one LMC executive told Dr. Hammett this "may be a good time for you to resign." Dr. Hammett refused. Two months later, LMC terminated Dr. Hammett.

63.     At all times relevant to this action, the referrals made by LMC's employee physicians to LMC did not and do not qualify for any statutory or regulatory exception from the Stark referral prohibition.

64.     Upon information and belief, LMC's employment agreements with its approximately two hundred and seventy five (275) employed physicians are the same or substantially the same as Dr. Hammett's agreement.

65.     These agreements pay *all* LMC physicians in excess of a fair market value by compensating them for the ancillary revenue they generate. This compensation constitutes a direct financial relationship between LMC and its employee physicians as contemplated by the Stark Laws.

66.     While Stark Law regulations *do* allow hospitals to require employee physicians to make referrals to the employer hospital, hospitals must strictly adhere to the regulatory safe harbor carved out by the HHS Secretary in order to invoke the referral requirement exception. The referral requirement exception applies if the physician's compensation plan is set in writing, in advance for the term of the agreement; does not take the volume or value of services into account; relates solely to the services the physician provides as an employee (or independent contractor); and permits referral to another provider on account of patient preference, insurance requirements, or the patient's best interest. See 42 C.F.R. § 411.354(d)(4).

67.      None of the physician employee agreements, including Dr. Hammett's, contain the mandated referral safe-harbor provision codified at 42 C.F.R. § 411.354(d)(4).

68.     As such, *all* LMC physician referrals to LMC for services are *per se* self-interested referrals forbidden by the Stark Laws.

69.     LMC submitted claims for reimbursement for services provided as a result of the self-interested referrals in violation of the Stark Laws. 42 U.S.C. § 1395nn(a)(1)(B).

70.     Compliance with the Stark Laws is a material condition for participation as a provider in a federal health insurance program.

71.     LMC expressly certified its understanding "that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law)[…]." CMS Provider/Supplier Enrollment Application, Forms 855-A and 855-B. LMC affirmatively agreed to abide by the "Medicare laws, regulations and program instructions" as a condition of its participation in federal health care programs. See id.

72.     Submitting a claim under false pretense of entitlement is a false claim under the FCA. LMC violated the FCA by knowingly presenting claims for payment to federal health insurance programs that are materially false on account of being predicated on self-interested physician referrals that violate of the Stark Laws.

**LMC's physician compensation scheme violates the AKA**

73.     LMC has also violated the AKA by knowingly and willfully inducing referrals from its employee physicians by paying remuneration contingent on the volume or value of services. 42 U.S.C. §1320a-7b.

74.     To incentivize patient referrals, LMC knowingly and willfully pays its employee physicians remuneration that accounts for the volume or value of referrals by LMC physicians and exceeds fair market value.

75.     This compensation scheme is not commercially reasonable because LMC pays employee physicians in excess of the net revenue they generate for LMC by providing physician services.

76.     As such, *all* LMC physician referrals to LMC for services are the product of an illegal kickback scheme in violation of the AKA and LMC submitted claims for services referred to LMC pursuant to this kickback scheme.

77.     Kickbacks are *malem in se*. Compliance with the AKA is also a material condition for participation in federal health insurance programs.

78.     LMC expressly certified its' understanding that AKA compliance is of material importance when it enrolled to participate in Medicare.  See CMS Provider/Supplier Enrollment Application, Forms 855-A and 855-B.

79.     Submitting a claim under false pretense of entitlement is a false claim under the FCA. LMC violated the FCA by knowingly presenting claims for payment to federal health insurance programs that are materially false on account of LMC's AKA violations.

80.     This action seeks damages, civil penalties, and disgorgement arising from the fraudulent claims paid pursuant to this scheme.

### COUNT I
### FCA VIOLATIONS OF 31 U.S.C. § 3729(a)(1)(A) & (B)[2]

81.     Plaintiff-Relator re-alleges and incorporates by reference each of the allegations in the preceding paragraphs as though fully set forth herein.

---

[2] To the extent wrongdoing occurred prior to May 20, 2009, this Complaint also alleges violations of the Federal False Claims Act prior to its recent amendments *e.g.,* 31 U.S.C. § 3729(a)(1).

82.     At all times relevant to this action, Defendant was legally obligated to only seek reimbursement for services provided to federally insured patients if Defendant complied with applicable federal law.

83.     At all times relevant to this action, Defendant was also legally obligated to take corrective action upon discovering that it received payment for services not provided or provided in derogation of Defendant's obligations under federal law.

84.     Instead, Defendant violated federal law and the terms and conditions of participation in federal health insurance programs by:

    a.    Entering into physician employment agreements that compensate physicians in a commercially unreasonable manner and/or in excess of fair market value in violation of the employment exception to the referral prohibition imposed by the Stark Law, 42 U.S.C. § 1395 nn;

    b.    Compensating employee physicians based on the volume or value of services referred to the hospital in violation of the Stark Law;

    c.    Tracking physician referrals for the purpose of compensating employee physician's for the volume and value of their referrals in violation of the Stark Law;

    d.    Accepting self-interested referrals prohibited by 42 U.S.C. § 1395nn(a)(1)(A);

    e.    Paying physician bonuses as compensation for referring ancillary services prior to acquiring CMG in violation of the Stark Law's referral prohibition;

    f.    Incentivizing self-interested referrals through a RVU compensation scheme that provides remuneration to physicians based on the volume and value of referred services;

    g.    Paying remuneration to employee physicians in exchange for referrals in violation of the AKA, 42 U.S.C. § 1320a-7b; and

    h.     In other such ways as discovered during the litigation of this action.

85.     Defendant knowingly, willfully and falsely certified its compliance with federal law when it submitted claims for payment that violated the Stark Law and the AKA in the manner described above.

86.     These violations are material to Defendant's participation as a provider in federal health insurance programs such that Defendant's fraudulent certification of compliance with federal law renders these claims false for the purpose of the FCA.

87.     Defendant knowingly and willfully presented these claims to obtain payment from federal health insurance programs including Medicare, TRICARE/CHAMPUS, and Medicaid.

88.     Defendant knew that the Medicare, TRICARE/CHAMPUS, and Medicaid programs relied on, and continue to rely on, Defendant's false certification that its claims complied with federal law.

89.     Defendant's fraudulent claims have been and continue to be paid by federal health insurance programs at great cost to United States taxpayers.

90.     Defendant's conduct is a violation of 31 U.S.C. § 3729(a)(1)(A) & (B), as amended.

## <u>COUNT II</u>
## FCA VIOLATION OF 31 U.S.C. § 3729(a)(1)(D)[3]

91.     Plaintiff-Relator re-alleges and incorporates by reference each of the allegations in the preceding paragraphs as though fully set forth herein.

92.     Defendant had possession, custody, or control over government monies paid pursuant to interim reimbursements that were subject to year-end correction by the Hospital Cost Report protocol.

---

[3] To the extent wrongdoing occurred prior to May 20, 2009, this Complaint also alleges violations of the Federal False Claims Act prior to its recent amendments e.g., 31 U.S.C. § 3729(a)(2).

93.     By illegally inducing physicians make referrals to LMC, Defendant fraudulently inflated the number of claims it made to federal health insurance programs.

94.     Had Defendant not fraudulently increased its revenues through the kickback scheme at issue here, Defendant would have retained less of the financial reimbursement paid by federal insurers.

95.     As such, Defendant's kickback scheme violates the FCA by causing fewer federal funds to be returned to federal insurers than would be returned but for Defendant's inflated revenues.

96.     Defendant's conduct is a violation of 31 U.S.C. § 3729(a)(1)(D), as amended.

<u>**COUNT III**</u>
**FCA VIOLATION OF 31 U.S.C. § 3729(a)(1)(G)**[4]

97.     Plaintiff-Relator re-alleges and incorporates by reference each of the allegations in the preceding paragraphs as though fully set forth herein.

98.     Defendant submitted claims for interim reimbursement and a Hospital Cost Report purporting to state all amount for which Defendant was legally entitled to bill federal health insurance programs.

99.     Notwithstanding these written statements by Defendant, Defendant knew it was not entitled to bill for services rendered pursuant to an illegal, self-interested patient referral.

100.     Had CMS known the truth, it would have reduced Defendant's reimbursement payments by disallowing payment of kickback-tainted claims.

101.     Instead Defendant knowingly concealed the fact that its interim claims and Hospital Cost Report are materially false in order to avoid repaying its ill-gotten gains.

---

[4] To the extent wrongdoing occurred prior to May 20, 2009, this Complaint also alleges violations of the Federal False Claims Act prior to its recent amendments <u>e.g.,</u> 31 U.S.C. § 3729(a)(2).

102.    Defendant's conduct is a violation of 31 U.S.C. § 3729(a)(1)(G), as amended.

## PRAYER

WHEREFORE, Plaintiff-Relator on behalf of himself and the United States prays:

i.      That Defendant cease and desist from violating the FCA, the Stark Laws,

        and the AKA;

ii.     That the Court enter judgment against Defendant:

>   1.  Awarding an amount equal to three times the damages that
>       the United States has sustained because of Defendant's
>       conduct, plus civil penalties of at least $5,500 to $11,000,
>       adjusted upward as specified by applicable law, for each
>       FCA violation of 31 U.S.C. § 3729;
>
>   2.  Awarding twice the amount of each kickback paid by
>       Defendant of up to $10,000 per kickback as required by 41
>       U.S.C. § 8706 of the AKA;
>
>   3.  Awarding Plaintiff-Relator the appropriate bounty pursuant
>       to 31 U.S.C. § 3730;
>
>   4.  Awarding Plaintiff-Relator attorneys' fees and costs of this
>       action, plus interest, including the costs to the United States
>       for its expenses related to this action;

iii.    That Defendant disgorge all sums by which it has been unjustly enriched

        by its illegal conduct;

iv.     That the United States and Plaintiff-Relator receive all relief, both at law

        and at equity, to which he may reasonably be entitled; and

v.      That the Court order such further relief as it deems just and proper.

## REQUEST FOR TRIAL BY JURY

Plaintiff-Relator hereby demands a trial by jury.

[signature page follows]

Respectfully submitted by:


s/Richard A. Harpootlian
Richard A. Harpootlian (Fed. ID # 1730)
rah@harpootlianlaw.com
Christopher P. Kenney (Fed. ID # 11314)
cpk@harpootlianlaw.com
RICHARD A. HARPOOTLIAN, P.A.
1410 Laurel Street
Post Office Box 1090
Columbia, SC 29202
Telephone: (803) 252-4848
Facsimile: (803) 252-4810

Jenkins Mann (Fed. ID # 9986)
jmann@rogerslewis.com
Shaun C. Blake (Fed. ID # 10358)
sblake@rogerslewis.com
ROGERS LEWIS JACKSON MANN
& QUINN, LLC
1330 Lady Street, Suite 400
Columbia, SC 29201
Telephone: (803) 256-1268
Facsimile: (803) 252-3653


ATTORNEYS    FOR    PLAINTIFF-RELATOR
DAVID H. HAMMETT, M.D.

Columbia, South Carolina
September 15, 2014